# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL MEJIA,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>J.D. HARTLEY, Warden<br><br>　　　　　Respondent. | 1:10-cv-00514-AWI-SMS (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND[1]

Petitioner is currently in the custody of the Department of Corrections and Rehabilitation following his conviction of second degree murder. He is serving a sentence of fifteen years to life plus a one year.

In the instant petition, Petitioner does not challenges the validity of the conviction; rather, he challenges the California Board of Parole Hearings' (Board) 2008 decision finding him unsuitable for release.

Petitioner filed a state petition for writ of habeas corpus in the Los Angeles County Superior challenging the Board's 2008 decision. The superior court denied the petition finding some evidence supported the Board's decision.

---

[1] This information is derived from the state court documents attached as exhibits to Respondent's answer.

1

1       Petitioner raised the same claims to the California Court of Appeal and California
2  Supreme Court. Both petitions were summarily denied.
3       Petitioner filed the instant petition for writ of habeas corpus on March 9, 2010, in the
4  United States District Court for the Central District of California. The petition was subsequently
5  transferred to this Court on March 23, 2010.
6       Respondent filed an answer to the petition on June 14, 2010, and Petitioner filed a
7  traverse on June 30, 2010.

## STATEMENT OF FACTS

On October 3, 1991, victim, Jose Velasquez was killed by a blunt force trauma to the head. At 9:30 p.m., Lawrence Mich, who lived on Belmont Avenue, heard two voices speaking Spanish outside near the front of his house. After about two minutes, the voices stopped. Then he heard what sounded like a wet soccer ball being kicked, about four heavy wet splat sounds. His wife opened the front door and saw two males dragging a third persons by the feet leaving a trail of blood. She then asked Mich to look. He saw the two men about 20 feet away dragging another man, who was bleeding from the head, by his ankles. He immediately called 911, then went out the front door and saw a trail of blood leading from his front yard to the footbridge over the 101 Freeway. About 50 feet down the footbridge, he saw a prone male on the ground. Two minutes later, Officer Webb arrived and saw the trail of blood leading from Mich's house to the footbridge over the 101 Freeway. He ran to the footbridge and saw Petitioner dragging a body over the bridge. Another man identified as Petitioner's cousin, Gregorio, was standing on the bridge holding onto a wall. Webb identified himself as a police officer and ordered Petitioner, who was still dragging the body, to stop, but instead Petitioner ran across the bridge away from the officer. Officer Webb chased Petitioner to apprehend him.

Detective Soler, found a large, bloody, concrete block at the scene, which weighted approximately 40 to 80 pounds. The blood on the rock was consistent with that of victim Velasquez and that of co-defendant Gregorio. Velasquez's injuries could have been caused by the concrete block. Petitioner and co-defendant Gregorio had blood on their clothes, which did not match either of their blood type. The victim's pockets had been turned inside out but none of

his property could be found at the scene or on co-defendant Gregorio. A bite mark matching Petitioner's teeth was found on Velasquez's body. Petitioner had a blood alcohol level of .23

Petitioner admitted he was drinking the day of the offense, and remembers walking with his cousin to Echo Park and saw the victim walk by. He admitted that words were exchanged with the victim by he and his cousin. He claimed to not remember bitting the victim. However, Petitioner remembered his cousin telling him to "pick up the body and carry it", which he did.

## DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an

1 unreasonable application of, clearly established Federal law, as determined by the Supreme Court
2 of the United States" or "resulted in a decision that was based on an unreasonable determination
3 of the facts in
4 light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,
5 538 U.S. at 70-71;Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

II.     Review of Petition

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme. Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010). "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is

4

suitable for parole is controlled by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to
> the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>> (C) The victim was abused, defiled or mutilated during or after the offense.
>> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.'
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in

prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

///

///

Section 2402(d) sets forth the circumstances tending to show suitability which include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9).

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing. Cal. Penal Code § 3041.5. If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute. Id. In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause. Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at 609. Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence. Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the

Board or the Governor.'" Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

### A. Last Reasoned Decision

The Los Angeles County Superior Court issued the last reasoned decision denying relief stating:

> The Petitioner was received in the Department of Corrections on June 21, 1994 after convictions for second degree murder [and] use of a deadly weapon. The term was 15 to life plus one year. His minimum parole eligibility date was November 6, 2002.
>
> The record reflects that the petitioner and his co-defendant, his cousin, beat the [victim], Jose Velasquez, to death with a concrete block. The victim died of blunt force trauma to the head. The petitioner and his cousin had both been drinking and celebrating a family member's birthday together. The petitioner states that the victim walked past the celebration and words were exchanged between him and the victim, but that he couldn't remember what was said. After they beat the victim into unconsciousness, the petitioner and the co-defendant were arrested while they were dragging the victim's body away.
>
> The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on August 4, 2008. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released. The Board based its decision on the commitment offense, the petitioner's psychological report, and his behavior while in prison.
>
> An inmate may be unsuitable for parole if the inmate committed the original offense in an especially heinous, atrocious or cruel manner. Cal. Code Regs., tit. 15, § 2402, subds (c)(1). The Court finds that there is some evidence to support the Board's finding that the commitment offense was especially heinous, atrocious or cruel as the petitioner and his co-defendant beat the victim to death with a large concrete block. A witness stated that it sounded like they were "kicking a wet soccer ball." This is a cruel way to kill a person and the victim certainly suffered abuse.
>
> As noted by the California Supreme Court in the case of *In re Lawrence* (2008) 44 Cal.4th 1181, 1221, the Board may base a denial or reversal of parole on the circumstances of the commitment offense, or other immutable factors, only if those facts support the ultimate conclusion that the inmate continues to pose an unreasonable risk to public safety. Thus, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness. *Id*. at page 1221.
>
> The Court finds that there were additional factors which were predictive of current dangerousness. The Board considered the petitioner's psychological report of 2008 and found that it did not fully support release. The report predicted that the petitioner's potential for violence in the free community to be low to moderate/low. The Board did not give the psychological report as much weight as in other cases, but did consider it as one factor.

Additionally, the petitioner did have three 115s during his time in prison, the most recent one being in 2003. Although the 115s were non-violent, they disturbed the Board as they found that they showed a pattern of petitioner's negative behavior. This is some evidence which supports the Board's finding that the petitioner is currently dangerous. Penal Code § 3041(b).

The Board did properly note the positive gains that Petitioner has achieved while incarcerated. Petitioner upgraded vocationally and is a skilled welder. The Board also noted that the petitioner had attended AA classes and had programmed appropriately. However, it was concluded that despite these gains, Petitioner remained an unreasonable threat to public safety at the time of his hearing. Penal Code § 3041(b). The Board was concerned that the petitioner was vague in referencing his parole plans in Nicaragua and they requested that petitioner be more specific. The Court finds some evidence to support the conclusion that the petitioner remains an unreasonable threat to public safety, based on the reasons stated above.

B.    2008 Board Hearing

At the 2008 hearing, the Board found Petitioner to be an unreasonable risk to public safety if released based on the cruel and callous nature of the commitment offense, institutional misconduct, psychological evaluation, and parole plans.

The murder was the result of words exchanged between the victim and Petitioner and his cousin. Petitioner and his cousin beat the victim to unconsciousness and struck him in the head with a 40 to 80 pound stone. One witness described the beating as sounding like a wet soccer ball being kicked, about four heavy wet splat sounds. After the beating, Petitioner and his cousin were found dragging the victim's body away to dispose of it. These circumstances demonstrate the crime was carried out in an especially callous manner and demonstrated a disregard for human life.

The California Supreme Court has held that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." In re Rosenkrantz, 29 Cal.4th 616, 682 (2002). However, in cases where prisoners have served their suggested base terms and have demonstrated strong evidence of rehabilitation and no other evidence of current dangerousness, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole. In re Lawrence, 44 Cal.4th 1191, 1211 (2008). In this case, at the time of Petitioner's parole hearing in 2008, he had only served fourteen years on his sixteen years to life term, and the Board did not rely only on the commitment offense.

The Board considered that Petitioner had received two serious rules violations (115s) during his incarceration. The most recent offense occurred in 2003 for possession of stolen property. Although neither rules violation involved violence, the Board was nonetheless concerned because it demonstrated a pattern of Petitioner's failure to follow the rules.

///

The Board cited but did not heavily weigh the psychological evaluation which placed Petitioner in the low/moderate range for future violence. Such finding was properly considered by the Board and superior court as a factor in determining whether Petitioner remains a current risk to public safety. See e.g. Hayward, 603 F.3d at 563 (psychologist's evaluation that prisoner posed a "low to moderate" risk of future violence, coupled with evidence that offense was particularly aggravated, is sufficient evidence to demonstrate future dangerousness to support denial of parole.)

The Board also expressed concern regarding Petitioner's parole plans for release to his native country of Nicaragua. Because alcohol played a major role in the commitment offense, the Board advised Petitioner to try to find a sponsor and information relating to alcohol related counseling in his native country. In addition, Petitioner indicated that he planned to live at his uncle's residence in Nicaragua, however, he did not provide any factual details relating to the living situation. Thus, given the lack of a solid plan for housing and alcohol treatment, the Board was legitimately concerned regarding Petitioner's parole plans in Nicaragua.

After considering the factors in support of suitability, the Board concluded the positive factors did not outweigh the factors of unsuitability, and the state court's determination of this claim was not contrary to or an unreasonable application of California's some evidence standard.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

1  Local Rules of Practice for the United States District Court, Eastern District of California.
2  Within thirty (30) days after being served with a copy, any party may file written objections with
3  the court and serve a copy on all parties.  Such a document should be captioned "Objections to
4  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served
5  and filed within fourteen (14) days after service of the objections.  The Court will then review the
6  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that
7  failure to file objections within the specified time may waive the right to appeal the District
8  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

10  IT IS SO ORDERED.

11  **Dated:     December 21, 2010**             /s/ Sandra M. Snyder
                                          UNITED STATES MAGISTRATE JUDGE